Our first case is 23-12-69, Stylwan Holding v. Stress Engineering. Mr. Ramey, I want to make sure I get the timing on this correct. You're going to speak for 11 minutes. You're reserving four minutes for rebuttal? Yes, Your Honor. Okay. And Mr. McKinnon, you have 10 minutes and four minutes for your cross-appeal. I think I had 10 minutes and five minutes. 10 minutes and five minutes. Okay. You may proceed. Good morning, Judge Ramey, Judge Tronto, and Judge Tude. My name is Bill Ramey, and I represent the appellant Stylwan. If it pleases the Court, may I begin? Stylwan appeals a district court's claim construction order and clarifying order, specifically one for introducing the phrase induced magnetic field into the construction of the signal and sensor claim terms because the phrase induced magnetic field can't be found anywhere in the claims of the patents in suit or the specification of the patents in suit. Just for housekeeping purposes, I know there were multiple different claim constructions that were made by the district court below, and then based on those multiple claim constructions, there was a stipulation of non-infringement here, right? Correct. Yes, Your Honor. Just to see if there's a way to confine the appeal, is do we have to affirm all of the claim constructions in order to affirm non-infringement, or is there some understanding that each one of those disputed claim constructions would be case dispositive? They would not be case dispositive. Your Honor, for this particular defendant, if the construction stayed for induced magnetic field, I think that one would be possibly dispositive. As it goes to the use of identifier equations, that one may also be case dispositive because that's the second issue I was about to get to. It's hard for me to say, as I sit here right now, whether it would be 100% case dispositive on the identifier equation. We wouldn't really constrain the induced magnetic field. Sure, but I guess the point here is you do agree that if we were to affirm all of the claim constructions, that would certainly be case dispositive, right? Yes, Your Honor. We had an argument, we believe, under the doctrinal equivalence. We dropped it for this appeal, so we still think there may be a doctrinal equivalence issue left, but there would not be literal infringement at that point. Okay. That's why this record is so long. We did original stipulation for literal infringement, and then after talking to the defendants through the course of the litigation, we decided to take the issue up on appeal rather than press forward with the DOE argument at that time. Sure, but for our purposes, you know, we have to be careful to avoid rendering advisory opinions, you know, reviewing issues where it doesn't really matter to the controversy. And so that's why I'm trying to figure out, if you were to say, yes, identify the equations dispute, that is case dispositive, that would be useful to know, or magnetic fields, or the autonomous construction, or, I don't know, whatever else was construed. Well, there actually isn't. Again, we still believe we have a doctrinal equivalence analysis under any outcome. If it stayed to be that we had to use identifier equation, that was the more difficult one for us to say that there was a doctrinal equivalence analysis, simply because the identifier equations are particular to the material under investigation, so they tend to be developed for specific for that material so they can correctly detect the imperfections in the material that they're evaluating. So that is, but for the induced magnetic field, we do think because of the breadth of the specification that we would have a doctrinal equivalence answer there. And then for the autonomous, because there are specific claims that claim manual processes that we haven't started, we think that claim differentiation. Now you're getting to the merits. I'm just trying to organize for our purposes, the court's purposes, what things potentially could be affirmed that would end the appeal for purposes of the stipulated non-infringement, non-literal infringement. For non-literal infringement, affirming any one of the three would end literal infringement. For doctrinal equivalence, we have an argument except for possibly on the identifier equation. That was the one that we ultimately decided to stipulate to non-infringement on that as well. Did that answer your question or did I? I think so. Maybe.  Well, I'll try to answer it better as I go forward. I'm sorry for my lack of clarity on that. And then the second issue, Your Honor, is that we wanted to discuss was whether the claim. Now I don't remember what the first issue is. That was about the induced magnetic field, whether or not that was properly incorporated into the claims. And the second issue is whether or not the specific identifier equations, the three that were identified for best mode purposes, whether a claim does be incorporated into the programming limitations of the claim. I thought the specification said that they were disclosed for enablement purposes, not best mode purposes. Isn't that the way the specification reads? That is. Yes, Your Honor. I was blending the terms. Our briefing talked about best mode as well, so I was blending the terms. But it does specify for enablement. Which suggests, indicates that without having disclosed those, then the claimed invention wouldn't be enabled, i.e., you need these equations in order for the claimed invention to work. Your Honor, the way that the patent was drafted, we were trying to draft the specification in such a way that someone with limited skill in the art could pick it up and practice it without any experimentation. Those identifier equations were specific for the material in the investigation for the tubulars it was disclosing. And so it wouldn't be impossible, more difficult for someone else to develop different identifier equations to work on different materials. In fact, that would be required if you were doing any sort of different material. But before I get to mathematical procedures that are described here in the rare of skill in the art to implement the autonomous NDI described herein without undue experimentation. Yes, Your Honor. So, I mean, to me that means that if I didn't give you these identifier equations, then it would require undue experimentation to carry out these claims. Your Honor, I think what that's saying is that the identifier equation was provided in the specification so that one with skill in the art could practice the claims without undue experimentation. But you could, with experimentation, formulate other identifier equations. With undue experimentation you could. I don't think it would be undue experimentation. Once you have one identifier equation, you see how the basic formulation for them go. We're not inventing a new rocket. We're just changing the rocket a little bit. It's not a wholly new equation. We would know by the equations we have. Well, you know, if we're changing material that we're inspecting, changing whether it's the type of material or the thickness of the material or the age of the material, it might be a factor. We would have that base identifier equation to modify from that point forward. But I do agree, without supplying those base identifier equations at all, then the patent would not have been enabled. We would have given something for one who already has skill in the art to practice. So that's all we were trying to do was to provide something that provided a leg up, that provided a mechanism so that they could go forward, practice the claims, and then modify from there that identifier equation for other materials that might be investigated or evaluated. And specifically, before I got back into claim construction, I wanted to spend just a short amount of time, if I could, talking about the 101 issue. I'm a little bit confused by a colleague on the other side's briefing. This is a 12B6101 dismissal that was denied by the district court. I'm sorry, the district court did two things. A formal thing, which is to deny the motion to dismiss, and a second thing, in the minute entry and then again in the judgment, said I find these claims to be eligible. That's more than I won't at the moment dismiss. And I assume as a result of that, when an answer and counterclaims were finally submitted, later obviously, they didn't include a 101 affirmative defense or a 101 counterclaim. So we actually have the district court making a positive eligibility finding back at the 12B6 stage. Yes, sir. We were very ecstatic about that being on our side. But that's the reason I bring it up that Pelley's brief is a little bit confusing because they seem to raise the issue that there's no factual issues at this stage, which of course the district court didn't rule on. In fact, as you said, Your Honor, made the factual finding. I don't believe the hearing transcript made it part of the record from the May 3, 2021 hearing. I didn't see it in the record when I was getting ready for this. It may be there, but on page 11 of that hearing, the district court specifically says he finds under Step 1 and Step 2 that the patents are valid. What hearing transcript is that? Sorry, Your Honor, May 3, 2021. It's a motion to dismiss. Judge Ellis, I believe, Your Honor, held three motions to dismiss hearings that day, and he addressed that one at the start, I believe, Your Honor. Where would you say we can find the most extensive explanation of the district court's 3-101 decision? Your Honor, it's going to be in the hearing transcript. If it's not there, then that wasn't made part of the record. That wasn't my part of the rush. I'm not displeased with the district court's ruling on the 1-01 issue. At appendix 0298, you have the minute entry, and then you have the order, the final judgments at the end of the case. That's what I saw in order, Your Honor. So back on your infringement, your affirmative appeal about the claim construction. Yes, Your Honor. Why does the combination of the specification and some of the prosecution history, and I'm interested in the first piece that you described as your first issue, whether magnetism needs to be used for detection in these claims. Why is it that everything except the claim language itself, that what's described as the invention here, as opposed to describing the prior art, is limited to use of magnetism? Yes, Your Honor. Well, I'd refer the court to, there's a common paragraph among all six patents, and it's mentioned on page 15 of our opening brief. Give me the column and line number of 320. Yes, Your Honor. Appendix 0034 for the 302 patent, column 9, lines 3 to 13. Appendix 0056. If it's repeated, you don't need to. It's the same paragraph. You don't need to say it. Let's focus on what it says.  Yes, Your Honor. It says, Preferably the inspection had eight relates to time-various continuous analog signals, but analogs in parentheses because they might not be, such as, but not limited to, echo, reluctance, resistance, impedance, absorption, attenuation, or physical parameters that may or may not represent an imperfection of the MUI-9 material under investigation. And which of those items listed are not magnetism?  Echo could be ultrasonic. No, no, no. Yes. Tell me which ones of those are necessarily not magnetism. My belief is it's going to be the echo, the absorption, the resistance. I thought absorption isn't... It's a type of magnetism, but you start by, pardon me, the attenuation, pardon me, and the physical parameters. Right, but that last clause, yeah, what would physical parameters... Well, they also, we have camera systems that are in there for visual, taking visual measurements of the different materials under investigation for whatever purposes that is, for whatever parameter they're measuring. We don't have any more time. Yes, Your Honor, I'm down to one minute and 30 seconds, so if the court would let me sit down to pick this back up in a second.  I'd like to ask one last question, I'm sorry. Yes, Your Honor. The joint stipulation of non-infringement... Yes, Your Honor. ...which begins at A11, but at A13 it's quite clear that it says, the parties now stipulate that given the court's construction of the terms in docket 93 and 108, there is no infringement of the asserted patents either literally or under the doctrine of equivalence. So to me, that reads like there is no possible doctrine of equivalence argument that could go back on remand. So, Your Honor, we put that language in there so it would have left an issue open at the Federal Circuit. We thought we did have an argument. We thought that we became less convinced of that argument as time went on, so that's what we stipulated. So we do currently stipulate that there's no infringement under the doctrine of equivalence. Okay. I mean, it's just like there's always an argument on each side of it, right? So we did have an argument. It just wasn't the strongest we didn't think. At that point, I do want to ask you... Yes, Your Honor. If you can, can you describe in layman's language what these three identifier equations mean? In layman's language, the identifier equation... I don't mean like kindergarten language. I just mean translating it into words. There are different ways that the sensors are told to act around the material in this. I need you to tell me what a is, little a, what x sub a is, what y sub a is, and what these... I think I understand what m is. It's just a constant or, anyway, could be a function also, and t is something you get out of a look-up table. Describe what's going on in those equations. I don't have more information about that, what those mean, knowing that those are the physical characteristics that the sensors are programmed with to operate, and you derive these different signals from the material by the sensor. Thank you. May it please the Court. My name is Christopher McKeon, and I represent the Cross-Appellant Stress Engineering Services. So I want to go real quick to the stipulation. So we stipulated to non-infringement under both literal infringement and under the Doctrine of Equivalence. We had filed a motion for a summary judgment on Doctrine of Equivalence, and that's when we agreed to this. The stipulation that was filed with the Court, we feel, ends the case. And if this Court... I think our discussion was about the possibility that our disagreeing... I'm sorry, about our agreeing with the even one or two or three, but not four, of the claim constructions that are before us, whether that subset of agreement might end the case. Well, right. Obviously that would be up to... in terms of stipulating to non-infringement. The only stipulation is the entire package of the claim constructions ends infringement. Yes. Yes. And there's no agreement that any one of these could be, although one of them could be. We've obviously looked at that ourselves as to which ones we could survive without. But as far as stipulating to non-infringement... Right. So let's get beyond the stipulation. What is your view? My view of which part? So I think Mr. Ramey agreed, or came close to agreeing, that if magnetism is required, then there cannot be infringement. I would agree with that, yes. Either a literal or equivalence. I think he said maybe that's true about the equations also, but maybe that agreement, not agreement between the parties, maybe that statement on his part was limited to literal infringement because maybe you all do something sufficiently like those equations that that something would be an equivalent. So as far as autonomous is concerned, if the autonomous language is in there, then so our client uses... I haven't gotten to that one yet. I'm sorry.  That's what at least I'm concerned with. So the infringing device, the alleged infringing devices, are accelerometers that measure vibrations and structures and lasers. Neither of these are disclosed as any type of sensor or operation in these specifications. That's not a form of ultrasonics, at least the vibration piece of it? I mean, an accelerometer, I guess my understanding is not a form of ultrasonics, but an accelerometer is measuring vibration and counting, basically counting movement left and right. What's the mechanism of conveying the vibration? It would be a transducer. A loop? It would be a transducer. So, Your Honor, this is something we haven't... I don't know. If there's a defect, then the defect is detected by the sensors by a change in the vibrations? The change in the vibrations would indicate there may be an issue, and then professional engineers would have to take a look at it and confirm what is actually happening. So Stress Engineering is a professional engineering company. They're consultants. So there is no... They're PEs. They have to sign everything. There's no automation. Like, they have to double-check, triple-check everything, and make a determination of what they think is occurring. So the vibrations would give them an indication that there could be a problem, but they would actually have to go and then do further inspection to find out what exactly was going on.  So maybe you can talk about the autonomous piece. Right. So the autonomous piece is simply this. They clearly describe their invention as autonomous. They use the word over and over again. They call the prior art remaining useful, life estimation, fit for service, and non-destructive inspection, and then they call their invention... How is your accused system not autonomous? The accused system... Well, it would be autonomous in that it autonomously maybe records data, but in terms of autonomously determining whether or not there is a defect and autonomously determining... distinguishing between defective and non-defective materials, that would not be something that... That is valid. That would have to be... An engineer would have to look at that and make that determination. You don't have some program computer system that's doing some signal processing on the outputs and then making a determination of... Well, you could. ...what the remaining useful life is of the material or whether there's an imperfection or what type of imperfection there is. I mean, there's obviously... There's a lot that goes into those determinations, and so there are computer algorithms that may be assisting with that, but at the end of the day, again, you know, when you're talking about... In these... In our client's particular situation where you're looking at, say, offshore rigs where you need professional engineers to sign off on whether or not the structure is suitable for continued use, it would require a... At the end of the day, it would require an engineer making a final determination and so... Does the accused system use these equations? The accused system does not use these equations. And as our expert has testified, Dr. Jacobs, these equations, as far as he could tell, were only... As far as he could tell, had no use outside of this particular invention disclosure. He could not identify another use or alternative use they had. They are specific to this invention. And... So is there or is there not some gap, maybe even a small gap between the language... The language of the claim construction on this autonomous point is that... Put aside the equations. Just that the program autonomously distinguishes between defective and non-defective materials. And slightly earlier in the same construction, autonomously recognizes the nature of the material features. How does that fit with the role of your professionals signing off? Seems to me both could be true. So in the case of... So in the case of, say, like a laser, a laser scanner going into a tubular is going to detect... It's going to detect maybe pits, cracks, but it's also going to detect pipe joints, features like that, right? Things that should be there, like threads, and things that shouldn't be there, like cracks. At the end of the day, an engineer is going to, at some level, have to go in and take a look at this and figure out, is this a crack? Is this supposed to be there? Or is this a design feature that was always there? And so that's where the engineer would have to make that final determination. You know, a lot of this is controlled by regulations regarding offshore stuff. You would not be able to just use AI without some accountability. A lot of this came about as a result of the disaster in the Gulf of Mexico many years ago. And so as a way to establish accountability, you can't just send it to the computer and say, Well, the computer said it, and that's what we're stuck with. They want engineers to approve this, review it, sign off on it, and second-guessing. They went through their... In their prosecution history, they more than once went after prior art, where there had to be some type of verification by humans, some type of second-guessing by humans, and they said that that was not... that the prior art did not apply to their patent. What would be a or even the best example in the prosecution history of what you just said? Well, the best example would be the PTAB brief. About the later patent application, the 038? The 038 application, yes. So in that one, when it's describing the claims, they specifically say that the claims are autonomous. They say that the present invention uses the identifier equations. They say that the identifier equations are fundamental to its operation. Where's that? 24-something? 2476, Your Honor. Hmm. And if you just... Honestly, if you just start at the top of independent, where it says independent claim one, if you go down, it says, the purpose of the invention is to avoid catastrophic failures in materials. And it goes on to say, tubulars are notoriously difficult to inspect for impending failures. And if we go down a little bit further, it says, experts cannot be available to repeatedly and frequently examine millions of miles of tubular. And then, even if the experts were universally available, experts cannot visually see faults within a tubular. And experts do not always evaluate 100% of each tubular. Accordingly, the present invention is provided with programming for non-destructive and autonomously evaluating tubulars along their entire length and area based on feature identifier equations. And they cite to the paragraph that's common to all the specifications, 0198. That's with the equations, one, two, three? That's the paragraph that says the fundamental operation, but it's the beginning of the discussion. It's, I believe, the one that, Your Honor... Column 10. Yeah. And if you go to the next page on 2477, when they talk about the material features acquisition aspect of the claim, that's where, and it's kind of about, it's the second to last claim element on the page. They say the fundamental operation is performed by identifier equations, which capture the material features on 098, figure 13, they reference figure 13, again, a common figure across all the specifications, and shows the data processing sequence along with the discussion 0198 through 227. The computer 20 recognizes a feature by comparing the identifiers with stored feature template database. So, these paragraphs, 0198 through 227, these are common across all the specifications. They include these... Just to be clear, do you think that the reference in paragraph 198, which is also paragraph 10, I mean, not paragraph, column 10 in the 320, kind of incorporates the slightly further down paragraphs that actually include equations one, two, and three? That is those specific equations? Yes, Your Honor. Okay. If we can... I don't think you need to... Okay. But it is, and we included the specification of the 098 in the, sorry, 038, is included in here as well if you go to... Right, in 2587, yeah. Yes. Right. And figure 13 clearly calls out equations one, two, or three, and those are the same equations one, two, or three that are referenced. Okay. What about the magnetic fields question when there are passages in the specification? It's a very long specification, very hard to read specification. But nevertheless, there are some moments where it talks about things other than magnetic information. Yes. In column seven, line 26, there's a sentence that says, the pipe's response to magnetic or ultrasonic excitation is not one of the design elements. And then it goes on and talks about MFL, magnetic flux leakage, but that could only just be an example. And then later down at line 50 of column seven, it says, regardless of the specific inspection technique utilized, the autonomous NDI device will preferably scan the material after each use. And what I wonder is, why doesn't passages like these open up this pattern for consideration beyond just magnetic information being received from the sensors? Well, in this particular case, Your Honor, because they specifically disclaimed ultrasonics and electromagnetics as being fundamentally different technologies in their PTAB arguments. Okay. This is in the prosecution where they were trying to overcome the prior art rejection. Right. There was an ultrasonic-based prior art reference being proposed to be combined with a magnetic information type prior art reference. Yes. And then they, in response, said, why would you ever make that combination? Those are two different technologies. Yes. That's not the same thing as, we only do magnetic flux leakage. We do not do ultrasonic. This particular argument I didn't find very persuasive. They also referenced it in their specification as being a manual process, the ultrasonics being a manual process that they were disclaiming against. If you look at APPX0031 at lines four, 15 through 20. Which column? Sorry, column four. Column four of what? Column four, lines 15 through 20. You're saying ultrasonic detection can only be done manually? It can't be done automatically, too? Well, I'm not saying that, Your Honor, but this is what they say. I mean, I guess it seems to me the natural reading of this is it's saying, manual things are deficient. We're going to do autonomous. And it lists a whole bunch of things that have been done manually, but that doesn't imply that if you can do any of those things autonomously, that that's outside the description of the invention. I'm out of time. Can I answer the question? I'd appreciate that.  So in this particular case, appellants have not been proposing claim language that would include all of these terms. Instead, they're just using this as more of a red herring to say that, well, we should just be entitled to these. Red herring doesn't help. There's claim language that is on its face undeniably broader than magnetism. Yes, like the 910 claim 41 is exceptionally broad. Right. And it would encompass any human inspection activity. So some combination of autonomous along with the identifier equations, obviously they have included other types of sensors in here, and they reference this camera, but then even in their own reply, they said that, well, a human can't inspect these pipes because they can't see below the surface. So that would preclude cameras. So while there are other sensors in here, they then make other statements later on in their prosecution history, on their appeal briefer, even in this briefing. You're out of time. Yes, I apologize for that. Did my colleagues have any other questions? I'll give you three minutes to address your counsel if you do that. Thank you very much. So, Your Honor, if I could, for just the last couple of minutes, I probably should have done a better job of explaining what this invention is. I like to think of it as you've read into the 1D systems and the 3D systems of the patent a lot. What our system is a continuous measurement, continuous evaluation of the material under investigation, such that it creates truly a three-dimensional or gets more facts about the material under investigation. And you can see that right if we're going to claim one of the 320. It talks about, I think that's appendix 0039-40, at least one imperfection detection sensor with an output set output comprising imperfection signals in a time-varying electrical format. So that's telling me that the data that it's collecting is being collected over time in a continuous nature. So you're getting, that's what the invention is. It's the continuous examination. And then if you go, in fact, down to, pardon me, Your Honor, the 894 patent, the appendix 0247, again, says repeatedly scamming in the second section there, material under evaluation. In the 894, are you now talking about a claim or something else? Yes, Your Honor. Claim only, Your Honor. My apologies. And so then the other claims refer to this material evaluation system. That section that I was reading earlier in my presentation, that actually refers to the continuous evaluation system. That's there for all the material evaluation systems. So we think that that would be read by one of ODA's scholarly arts, being what that system, how that system operates, how that material inspection system and material feature acquisition system, they called it about seven different things, and six patents, so it was a little bit confusing. But all of them carry that same paragraph we talked about earlier. All of them carry that three-dimensional limitation, you know, the benefit, the advancement over the prior is the way that they measure. I wanted to address fairly – I'm sorry. I don't – did you propose a claim construction that included language of the sort you're just talking about, about having to repeat the detection operation to form something that you would call three-dimensional? I thought you said everything is plain and ordinary except for a few little things that are not material here. Correct, Your Honor. And we think that one of ODA's scholarly art, plain and ordinary meaning still doesn't construe something in a vacuum. So that one of ODA's scholarly art would be – would construe that as plain and ordinary meaning after having read all six patent specifications and seeing that every one of them talks about this material acquisition system that operates in a continuous manner that acquires these features so that it has more of a three-dimensional representation. And what is the bearing of this discussion in the last few minutes on the specific claim construction issues? Just to explain, I'm getting to that next point now where we're talking about the autonomous and whether or not autonomous impacted the entire features. What I'm agreeing is that we do autonomously measure the material, but then there can be manual intervention after that to look at the results from that. And, in fact, because we're clearly – at appendix 1954 through 1956, we clearly distinctly show that the autonomous only modifies the inspection system, and then you have aim control. So that's not – it's not modifying the control portion. So the control portion could be done automatically, could be done by a computer program as some of the claims require, or it could be done by an operator. But what about just concluding that everything that's happening in these claims is happening autonomously? Is that – do you have an objection to that? Yes, Your Honor, because they do have certain claims that modify that, patent claims for human interaction, and humans are involved in this. Specifically, Your Honor, especially claims from the 874 patent claims, 2, 3, 4, 5, 6, 17, 18, and 32. And for the 910 patent claim, 27. I know, but just representative claim 1 of the 874, the key act in the claim is where the computer is programmed to utilize the equations and coefficients to estimate the remaining useful life of the material under evaluation. Why isn't that autonomous? Why isn't that automatic? It could be automatic. It's not limited to being automatic, Your Honor. I think that the measurement system – The computer is programmed to use these equations to estimate the remaining useful life of the material. That's all computerized. Yes, Your Honor. So it's automatic. Yes, it can function in an automatic or at least a partial automatic state that it could have an intervention of a human operator after it does that inspection to verify or to look at other things or to even combine things in a combined inspection method. Just one more time. If we were to affirm on autonomous and affirm on the identifier equations, they need to be in the claims. Does that end this case? I wanted to clarify that because I didn't mean to do this, but – That's the answer. No. So for those, we have a D.O.T., D.O.E. argument of magnetism, we thought. We don't think we have one that's very good for the equations. So if you affirm on the equations, I didn't want to misrepresent that to the court. But we do think for autonomous, we also have a very good D.O.E. argument as well. But you're saying for the identifier equations, you don't. We think that's our weakest argument, yes. Yes, Your Honor. So we stipulated an infringement, so we're not going to go back and if the court were to affirm on everything, we wouldn't go back. We know that. That's not the question. The question is identifier equations and autonomous. Autonomous, we thought we had a very strong D.O.E. argument. The question can't be about what you thought. Well, we still think we have a strong D.O.E. argument, but we're – But you just said on identifier equations you don't. So what I'm trying to figure out is if you would just affirm this case if we were to affirm on identifier equations and autonomous only. Yes, if you did on both, we can't make it on the identifier equation. Okay. So, Your Honor, thank you very much, Your Honor. Your Honors, I just wanted to direct your attention to our brief on Docket 38. This is page 31 at the top, or 30 and 30. Are we talking only about the 101 question? You don't get to say that for a second. Okay, you're right. I'm sorry about that. With regards to 101, I guess I don't really know if he even mentioned 101 other than – I don't know if he did. We mentioned that when we asked him the question, but it wasn't much. You don't have to address it if you don't want. I will address 101. Okay. Yeah. Did you have a specific question you wanted me to address? This is not a counterclaim, right? This is an alternate basis to affirm non-infringement. Is that right? Yeah. This is if this court broadened the claims. So, under the stipulation, there is no case, right? But if you changed or broadened those claims, then, yeah, we were bringing the argument that they were. But if we concluded that there was non-infringement, then we don't have to address your 101 issue because it's not a freestanding counterclaim. That's my understanding. Yes, Your Honor. Okay. Thank you. Any other questions? I really appreciate it. Thank you. Thank you, Your Honor. I believe you have time left to address, but we didn't have any argument on the counterclaim, so you don't need to say anything here. No, Your Honor, I'm finished. You're done. Thank you very much. Okay. Thank you. Thank the parties for their arguments.